**SANTA FE PACIFIC REALTY CORPORATION, Plaintiff,**

v.

**UNITED STATES of America; Richard G. Armor, an individual; Clifford Dana, an individual; and Dora Dana, an individual, Defendants.**

No. Civ. S-90-0361-WBS/JFM.

United States District Court,
E.D. California.

Dec. 10, 1991.

John F. Barg, Brian S. Haughton, Landels, Ripley & Diamond, San Francisco, Cal., for plaintiff.

Stuart M. Gerson, Asst. Atty. Gen., Trial Atty., Torts Branch, Civ. Div., U.S. Dept. of Justice, Bary M. Hartman, Acting Asst. Atty. Gen., Trial Atty., Environment & Natural Resources Div., Environmental Defense Section, U.S. Dept. of Justice, Washington, D.C., for defendant U.S.

Robert N. Black, Black & Kooper, Davis, Cal., for defendant Robert G. Armor.

Thomas L. Gill, Favaro, Lavezzo, Gill, Carpetti & Heppell, Vallejo, Cal., for defendants Clifford Dana and Dora Dana.

## MEMORANDUM AND ORDER

SHUBB, District Judge.

This matter is before the court on defendant United States' motion to dismiss, motion for judgment on the pleadings, motion to strike, and plaintiff's motion for partial summary judgment.

### I. *Procedural and Factual Background*

Plaintiff, formerly Santa Fe Pacific Realty Corporation (hereinafter "Catellus"), initiated this action for damages and declaratory relief on August 18, 1989, against defendants, United States of America, Richard G. Armor, Clifford Dana and Dora Dana. The case arises out of the discovery of a hazardous waste site located on plaintiff's property. The first amended complaint contains twelve claims for relief for: (1) a declaration that all defendants are liable under the Comprehensive Environmental Response Compensation and Liability Act of 1980 ("CERCLA"); (2) recovery of costs under CERCLA against all defendants; (3) breach of lease against the Danas; (4) contractual indemnity against the Danas; (5) breach of third party beneficiary contract against Armor; (6) negligence against the United States; (7) negligence against the Danas; (8) negligence against Armor; (9) nuisance against Armor and the Danas; (10) strict liability against Armor and the Danas; (11) waste against Armor and the Danas; and (12) conspiracy against Armor and the United States.

### A. The Hazardous Waste Site

The following facts appear undisputed.[1] Plaintiff Catellus owns a barn and adjacent tarmac-covered area (collectively, the "warehouse") in Collinsville, California. Declaration of Brian S. Haughton in support of Plaintiff's motion for summary judgment, exhibit C. Catellus' tenants, defendants Clifford and Dora Dana, subleased the warehouse to defendant Richard G. Armor from 1981 through 1989. *Id.*

In April 1989, Solano County officials investigated and discovered substantial quantities of hazardous substances stored on the property. *Id.* at exhibit D. Both Catellus and County experts concluded that there existed a substantial and imminent risk of fire and explosion leading to a poisonous cloud that could affect people a mile or more away. Haughton Decl. at ¶ 13. County officials characterized the scene as "a time-bomb waiting to go off." *Id.* at ¶ 15.

### B. Surplus Sales to Armor

The majority of the chemicals stored on the property were purchased by Armor from defendant United States of America at public auction sales conducted during the 1970's by the Defense Property Disposal Service ("DPDS"), an agency of the Department of Defense ("DOD"), and the United States General Services Administra-

---

**1.** The facts concerning the discovery and investigation of the hazardous waste site are set forth in fuller detail in the court's decision filed June 5, 1991 in the related case of *Western World Ins. Co. v. Dana,* 765 F.Supp. 1011 (E.D.Cal.1991).

tion ("GSA"). *See* Haughton Decl. in support of Catellus' opposition to United States Motion to Dismiss, exhibit B at 62; Haughton Decl in support of summary judgment at ¶ 19. Armor acquired under his own name and various fictitious names, numerous materials from the United States including chemicals, paints, solvents, insecticides, lubricants, lacquer, varnish, and liquid helium. Haughton Decl. in support of plaintiff's motion at ¶ 24, exhibit R.

## C. The Surplus Program

The Federal Property and Administrative Services Act of 1949 ("Act"), 40 U.S.C. §§ 471–544, authorizes the United States to sell or otherwise dispose of surplus government property. With respect to property deemed "surplus," the Act permits the disposing agency to choose the method of disposition:

> Any executive agency ... authorized ... to dispose of surplus property may do so by sale, exchange, lease, permit, or transfer, for cash, credit, or other property, with or without warranty, and upon such terms and conditions as the Administrator [of GSA] deems proper.

40 U.S.C. § 484(c). As to property that the disposing agency decides to dispose of by public sale, the legislation requires that:

> [A]ward shall be made with reasonable promptness by notice to the responsible bidder whose bid, conforming to the invitation for bids, will be most advantageous to the Government, price and other factors considered: Provided, that all bids may be rejected when its in the public interest to do so.

*Id.* at § 484(e)(2)(C).

The administrator of GSA has delegated to DOD the authority to dispose of surplus personal property. 41 C.F.R. § 101–45.103. Within DOD, the authority to dispose of surplus property is delegated to the Defense Logistics Agency ("DLA"), whose mission is to provide logistics support to the individual military services and to assigned federal civilian agencies and foreign governments. Declaration of Susanne Metzger at ¶ 2 (attached as United States' exhibit A.). During the relevant period,

roughly 1974–1980, a component of the DLA, the Defense Property Disposal Service ("DPDS"), was responsible for the utilization and marketing of DOD personal property worldwide. *Id.* at ¶ 3.

Between 1974 and 1980, DOD's property disposition system essentially comprised a series of successive steps to screen property for reuse within DOD, transfer to other federal agencies, and donate to non-governmental organizations. *Id.* at ¶ 5. What remained after this screening process was eligible for sale to the public. *Id.* at ¶ 9. The disposition of surplus property was governed by the Defense Disposal Manual ("Manual"), DOD 4160.21–M. *See* at ¶ 5. The Manual vested the appropriate DOD authorities with authority in determining how to dispose of excess and surplus property: "Personal property (including scrap) will be disposed of in a manner which will assure maximum Federal utilization through withdrawal or transfer; permit authorized donation to satisfy valid requirements; obtain optimum monetary return to the Government for property sold; and minimize the need for abandonment or destruction." *Id.* at I–1. Under the Manual, Defense Property Disposal Offices during the 1970's were responsible for disposal of all DOD surplus property *except* refuse, trash, material prohibited from sale by U.S. law or regulation, and material having no utilization or sales potential.

## II. *Defendant's Motions*

### A. Motion To Dismiss

#### 1. *Sixth Claim–Negligence*

The United States contends the court lacks jurisdiction over plaintiff's sixth claim for relief based on negligence because the sale of surplus government property is protected by the discretionary function exception to the Federal Tort Claims Act ("FTCA"). The FTCA constitutes a limited waiver of sovereign immunity. *United States v. Orleans*, 425 U.S. 807, 813, 96 S.Ct. 1971, 1975, 48 L.Ed.2d 390 (1976). Because the government "can be sued only to the extent that it has waived its immunity, due regard must be given to the

[FTCA's] exceptions." *Id.* at 814, 96 S.Ct. at 1976.

Section 2680(a) of the FTCA provides that the United States does not waive its sovereign immunity for:

[a]ny claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

Whether an action is a discretionary function, and therefore not actionable under the FTCA, depends on: (1) whether a choice or judgment is involved and is not circumscribed by a "statute, regulation or policy specifically prescribing a course of action for the employee to follow and (2) whether the decision or activity is "grounded in social, economic or political policy." *Berkovitz v. United States*, 486 U.S. 531, 536–37, 108 S.Ct. 1954, 1958–59, 100 L.Ed.2d 531 (1988). A purpose of the exception is to prevent judicial 'second guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort. *United States v. S.A. Empresa De Viacao Aerea Rio Grandense*, 467 U.S. 797, 814, 104 S.Ct. 2755, 2764–65, 81 L.Ed.2d 660 (1984). Recently, in *United States v. Gaubert*, — U.S. —, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991), the Court elaborated on the discretionary function exception:

When established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion. For a complaint to survive a motion to dismiss, it must allege facts which would support a finding

that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime. The focus of the inquiry is ... on the nature of the actions taken and on whether they are susceptible to policy analysis.

*Id.* 111 S.Ct. at 1274–75.

The decision of the United States to sell hazardous materials in this case, rather than dispose of them by some other method, falls within the exclusion of § 2680(a). *See Myslakowski v. United States*, 806 F.2d 94 (6th Cir.1986), *cert. denied*, 480 U.S. 948, 107 S.Ct. 1608, 94 L.Ed.2d 793 (1987) (decision to sell surplus jeeps concededly fell within statutory exception). Congress also left to the agency the discretion to define the terms and conditions of the sale of surplus property. "Any executive agency ... authorized ... to dispose of surplus property may do so by sale, exchange, lease, permit, or transfer, for cash, credit, or other property, with or without warranty, and upon such terms and conditions as the Administrator [of GSA] deems proper." 40 U.S.C. § 484(c). *See Myslakowski*, 806 F.2d at 97 (exception extends not only to decision to sell jeeps but also to the terms and conditions of the sale); *see also Smith v. Johns–Manville Corp.*, 795 F.2d 301 (3rd Cir.1986) (same); *In re All Maine Asbestos Litigation*, 581 F.Supp. 963, 971 (D.Maine 1984), *aff'd*, 854 F.2d 1328 (1988) (government decision to sell asbestos "as is" with no warnings in unmarked crates to knowledgeable buyers involved a weighing of economic and other policy factors and falls within the discretionary function exception).[2]

Nevertheless, plaintiff argues that the United States cannot rely on the exception, in part, because in disposing of the

---

2. Plaintiff also argues the decisions to sell hazardous material to Armor runs contrary to "transcendent" social policy embodied not only in the policy of DPDS, but also assorted other bodies of law, including the National Environmental Policy Act of 1969 and the Resource Conservation and Recovery Act. First, as defendant points out, the fact that the Executive Branch of government is often called upon to reconcile apparently conflicting goals in executing laws and policies—in this case, economic and environmental—only serves to illustrate the element of discretion involved in this case. *See Gaubert*, 111 S.Ct. at 1274–75. Second, to the extent these policies apply, they do not provide the sort of specific and mandatory standards necessary to take this case out of the discretionary function exception. *See Starrett v. United States*, 847 F.2d 539, 541 (9th Cir.1988).

692

hazardous waste it violated its own regulations and policies. The complaint alleges:

> The United States and its agencies and employees had a duty ..., and to comply with all applicable laws, regulations, and guidelines to protect the public health and safety as well as the environment.

The United States concedes that in at least two transactions with Armor arising in 1975 and 1976 it did not follow its own policies and procedures when it sold Armor materials classified as hazardous without alerting him of certain special handling requirements. Thus, to the extent plaintiff challenges the United States' failure to comply with its own regulations mandating specific standards for processing and selling hazardous material, the discretionary function exception does not bar plaintiff's negligence claims against the United States. *See Baker v. United States*, 817 F.2d 560 (9th Cir.1987), *cert. denied*, 487 U.S. 1204, 108 S.Ct. 2845, 101 L.Ed.2d 882 (1988) (government employee's negligent failure to obey a regulation or policy is actionable under the Federal Tort Claims Act).

■ In one instance, the complaint alleges the United States breached its "duty of care by including said hazardous substances and wastes in lots for auction to the general public." Complaint at ¶ 57. Both parties apparently construe this phrase as an allegation that the government violated its own internal policies by selling to Armor lots containing chemicals commingled with more desirable items having commercial use. The relevant provision of the DPDS Handbook 4160.1 at VI–2, ¶ h, provides that materials for sale normally will be "lotted to produce estimated proceeds of" a specified dollar amount, but that "[a]n exception to this policy would be those instances when items should not be commingled with other property because of ... their nature (e.g., hazardous, MLI)...." Exhibit F in support of the United States' motions.

The language of that provision is not the sort of specific mandatory language which takes this case outside the discretionary function exception. The language sets forth a policy or standard which *should* be followed, but does not mandate adherence. *Cf. Chamberlin v. Isen*, 779 F.2d 522, 525 (9th Cir.1985) (where guideline only suggests or authorizes procedures for patent examiners to follow, court found discretionary exception applied). Consequently, even to the extent the complaint asserts a claim for negligence based on the practice of commingling, the claim is still barred by the discretionary function exception.

■ The complaint also alleges that the United States sold hazardous materials in damaged or leaking containers. The decision to sell hazardous waste in damaged or leaking containers is not grounded within the regulatory policy regime.[3] It strains credulity to suggest that the discretion to sell surplus materials economically and efficiently or even "as is" includes the discretion to sell improperly packaged hazardous materials. *Cf. ARA Leisure Services v. United States*, 831 F.2d 193, 196 (9th Cir. 1987) (mere fact that Park Service required to work within a budget did not bring their failure to maintain a park road within the discretionary function exception).

The on-site act of selling or deciding to sell hazardous materials in damaged or leaking containers cannot be said to be governed by any policy consideration. *Kennewick Irr. Dist. v. United States*, 880 F.2d 1018, 1031 (9th Cir.1989) ("The contracting officer's on-site decisions were not 'of the nature and quality that Congress intended to shield from tort liability.'") (citing *Varig*, 467 U.S. at 813, 104 S.Ct. at 2764). Unlike the decision to sell rather than otherwise dispose of the hazardous materials, the deliberate or inadvertent act of selling those materials in damaged or leaking containers once that decision has been made is a mere ministerial act, unprotected by the discretionary function exception to the FTCA.

---

3. Plaintiff's exhibit C. *Response to Interrogatories of Richard C. Armor suggests some contain-* ers were leaking at the time of sale.

The *Myslakowski* line of cases does not compel a contrary conclusion. In those cases, the courts concluded that the establishment of terms and conditions of the sale of Jeeps and asbestos fell within the discretionary function exception.

> Here, the decision to sell the vehicles included consideration and adoption of certain limiting conditions: the sale was to be "as-is-where-is."

*Myslakowski*, 806 F.2d at 98; *see also Johns–Manville*, 795 F.2d at 308. In each of those cases, the court could point to a weighing of policy considerations at some decision-making level and an on-site decision which fell within the scope of the discretion reserved for on-site decision. In other words, the contracting officer had "room for policy judgment and decision." *Kennewick Irr. Dist.*, 880 F.2d at 1031.

The decision to sell "as is" does not necessarily exempt all actions taken in the process of implementing that decision any more than the decision to avoid costs exempts the failure to maintain a road (*See ARA Leisure Services*) or the failure to remove unsuitable materials during construction (*See Kennewick Irr. Dist.*). An allegation that the United States sold chemicals at auction in damaged or leaking containers suggests on-site actions or decisions which are outside the balancing of policy considerations. *Cf. ARA Leisure Services*, 831 F.2d at 195 ("[I]t is insufficient for the government to show that some choice was involved in the decision-making process.... The balancing of policy considerations is a necessary prerequisite.").

### 2. *Twelfth Claim–Conspiracy*

■ The substantive law of the State of California applies in determining liability on plaintiff's claims under the FTCA. *See* 28 U.S.C. § 2674. Under California law, there is no separate tort of civil conspiracy. The only significance of a cause of action for conspiracy is that it renders each participant in the joint venture liable for all damages proximately resulting from the underlying tort regardless of the degree of his activity. *In re Sunset Bay Associates*, 944 F.2d 1503, 1516 (9th Cir.1991); *Harrell v. 20th Century Ins. Co.*, 934 F.2d 203, 208

(9th Cir.1991); *Ting v. United States*, 927 F.2d 1504 (9th Cir.1991). Thus, to the same extent that plaintiff's negligence claim is barred by the discretionary function, the conspiracy claim is likewise barred.

■ The United States contends that the statute of limitations also bars the claim for civil conspiracy because the last overt act in furtherance of the conspiracy occurred more than two years prior to the time the action was commenced. Under the FTCA, a tort action must be presented to the appropriate federal agency within two years after such claim accrues. 28 U.S.C. § 2401(b). While the last overt act doctrine may be controlling for determining when a federal civil rights conspiracy claim accrues, *see Gibson v. United States*, 781 F.2d 1334, 1340 (9th Cir.1986), *cert. denied*, 479 U.S. 1054, 107 S.Ct. 928, 93 L.Ed.2d 979 (1987), the question of when a claim accrues under the FTCA depends on the applicability of the diligent discovery doctrine. "Under federal law, a cause of action generally accrues when a plaintiff knows or has reason to know of the injury which is the basis of his action." *Gibson*, 781 F.2d at 1344; *cf. Barrett v. United States*, 689 F.2d 324 (2nd Cir.1982), *cert. denied*, 462 U.S. 1131, 103 S.Ct. 3111, 77 L.Ed.2d 1366 (1983) (court applied diligent discovery rule on conspiracy claim under FTCA where plaintiff alleged defendant actively covered up its involvement).

Plaintiff has alleged it did not learn of the presence of hazardous substances on the property until on or about April 20, 1989. *See* Complaint ¶ 17. If plaintiff reasonably did not learn of the injury until 1989, it is impossible to say that it knew or should have known of the cause of its injury any time prior to 1989. That allegation precludes the court on a motion to dismiss from finding that the statute of limitations bars plaintiff's conspiracy claim.

The United States also questions whether a conspiracy claim can be maintained under the FTCA. In support, it relies on two district court cases asserting that the misrepresentation and discretionary function exceptions bar conspiracy claims.

*First Sav. and Loan Ass'n v. First Federal Sav. and Loan Ass'n. of Hawaii,* 547 F.Supp. 988 (D.Haw.1982); *Goodman · v. United States,* 324 F.Supp. 167 (M.D.Fla.), *aff'd,* 455 F.2d 607 (5th Cir.1971). However, those cases only hold that a conspiracy claim, like any other claim under the FTCA, may fall within an exception to the government's waiver of sovereign immunity. 28 U.S.C. § 2680. Whether plaintiff may successfully maintain its conspiracy claim will depend upon whether it can establish the wrongful act and damages resulting therefrom. *Harrell,* 934 F.2d at 208. Thus, whether plaintiff's claim is barred by any exception to the FTCA depends on the nature of the underlying wrong upon which the allegation of conspiracy rests. As the court has noted above, the discretionary function exception may bar some but not all of plaintiff's underlying allegations of wrongdoing.

### B. Motion for Judgment on the Pleadings

Pursuant to Fed.R.Civ.P. 12(c), the United States moves for partial judgment on the pleadings on plaintiff's claims for attorneys' fees and costs as well as prejudgment interest under CERCLA. "Judgment on the pleadings is proper when there are no issues of material fact, and the moving party is entitled to judgment as a matter of law." *General Conference Corp. of Seventh–Day Adventists v. Seventh–Day Adventist Congregational Church,* 887 F.2d 228, 230 (9th Cir.1989), *cert. denied,* 493 U.S. 1079, 110 S.Ct. 1134, 107 L.Ed.2d 1039 (1990).

#### 1. *Attorneys' Fees*

■ The general rule is that "the prevailing party may not recover attorneys' fees as costs or otherwise." *Alyeska Pipeline Service Co. v. Wilderness Soc'y,* 421 U.S. 240, 245, 95 S.Ct. 1612, 1615, 44 L.Ed.2d 141 (1975). "[A]bsent explicit congressional authorization, attorneys' fees are not a recoverable cost of litigation." *Runyon v. McCrary,* 427 U.S. 160, 185, 96 S.Ct. 2586, 2601, 49 L.Ed.2d 415 (1976) (paraphrasing the holding of *Alyeska* ).

Plaintiff argues that in enacting CERCLA, Congress intended for a private party to recover fees. It reasons that 42 U.S.C. § 9607(a)(4)(B) permits a private person to recover "necessary costs of response ... consistent with the national contingency plan." Further, 42 U.S.C. § 9601(25) defines "response" to mean "remove, removal, remedy, and remedial action, all such terms (including the terms 'removal' and 'remedial action') include *enforcement activities related thereto.*" (emphasis added). The phrase "enforcement activities related thereto" encompasses the activities of a private party to enforce its rights under CERCLA and these activities include litigation.

A sharp split of authority exists regarding whether attorneys' fees are available to a private party as "response costs" under CERCLA. *See General Elec. v. Litton Indus. Automation Systems,* 920 F.2d 1415, 1422 n. 10 (8th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1390, 113 L.Ed.2d 446 (1991) (listing cases on both sides of controversy). Three distinct, yet interrelated, lines of inquiry have emerged: (1) whether the phrase "enforcement activities related thereto", added to the definition of "response" by the 1986 amendments to CERCLA, includes the activities of private persons; (2) whether the language is sufficiently explicit to constitute congressional authorization for an award of fees; and (3) the degree to which policy considerations support an award of fees to a private party. An examination of each of these three considerations leads this court to the conclusion that an award of fees to private parties is not authorized as a form of response costs under CERCLA.

First, it is not at all plain from the statutory scheme that private parties can incur enforcement costs for "enforcement activities." *Cf. Key Tronic Corp. v. United States,* 766 F.Supp. 865, 871–72 (E.D.Wash. 1991) (appeal pending) ("Although the court acknowledges the force of the Government's position that the statutory scheme implies that enforcement activities are those actions taken by the EPA to require compliance with CERCLA, ..."). While the Ninth Circuit has twice charac-

terized a response cost recovery claim brought by a private party as "a private enforcement action" those characterizations appear in dicta, *see Key Tronic,* 766 F.Supp. at 869, and the issue remains unresolved in this context. *See T & E Indus., Inc. v. Safety Light Corp.,* 680 F.Supp. 696, 708 n. 13 (D.N.J.1988).

The legislative history does not provide much guidance. In fact, the legislative history tends to support the inference that Congress did not intend private parties to recover enforcement costs. In 1986, Congress amended the definition of "response" to include "enforcement activities." Explaining this amendment, the Committee on Energy and Commerce indicated that "section [101] also modifies the definition of 'response action' to include related enforcement activities. The change will confirm the *EPA*'s authority to recover costs for enforcement actions taken against responsible parties." H.R.Rep. No. 253, 99th Cong., 1st sess. pt. 1, at 66–67 (1985), *reprinted in* 1986 U.S.C.C.A.N. at 2835, 2848–49 (emphasis added). At least one court has inferred from this legislative history that "[Congress] did not intend to allow private parties to collect attorneys' fees in private cost-recovery actions." *Fallowfield Development Corp. et al., v. Strunk,* No. 89–8644, 1990 WL 52745, 1990 U.S.Dist. LEXIS 4820 (E.D.Pa.1990).

Nonetheless, plaintiff argues the more pertinent legislative history is found in the Conference Committee Report. That report omits the explicit reference to the EPA. *See* H.R.Conf. Report No. 962, 99th Cong., 2d Sess.1985 (1986). From this omission, plaintiff asks the court to conclude that Congress contemplated the phrase "enforcement activities related thereto" to include all enforcement activities, not just those of the government.

While the omission of the reference to the "EPA" in the Conference Committee Report casts doubt upon whether Congress intended to limit "enforcement activities"

to activities of the EPA, it does not form a basis for affirmatively concluding Congress intended private parties to recover attorneys' fees as enforcement costs. The court is extremely reluctant in this context to glean Congressional intent from the failure of one body of Congress to precisely reiterate in a report the language used by another body of Congress.

Second, beyond the ambiguity over whether private persons were intended to undertake "enforcement activities" under CERCLA, the phrase "enforcement activities related thereto" falls short of an explicit award of attorneys' fees. When Congress intended to provide for an award of attorneys' fees in other circumstances under CERCLA, it did so explicitly. For instance, for private citizen suits, § 9659(f) authorizes courts to "award costs of litigation (including reasonable attorney and expert witness fees) to the prevailing party whenever the court determines such an award appropriate." Congress, in undertaking a comprehensive amendment to CERCLA in 1986, had an opportunity to explicitly make attorneys' fees available to private parties as response costs but chose not to do so. *See Regan v. Cherry Corp.,* 706 F.Supp. 145, 148–50 (D.R.I.1989) ("SARA was a comprehensive overhaul of CERCLA. Therefore, it would have been a simply [sic] matter to amend § 107 to allow recovery of attorney fees."). Instead, Congress chose to insert a phrase outside even the most exhaustive lexicon of customary fee shifting language.

The court "refuses to create a right to recovery of attorney fees where Congress has not expressly stated such to exist." *T & E Indus., Inc.,* 680 F.Supp. at 708; *cf. State of Idaho v. Hanna Min. Co.,* 882 F.2d 392, 396 (9th Cir.1989) ("CERCLA does not state whether attorneys' fees may be awarded for actions for natural resources damages under 42 U.S.C. §§ 9607(a)(4)(C) and 9607(f), ... We elect to make no award of attorneys' fees.").[4]

---

4. Although it has been noted by plaintiff and others that "CERCLA is not a paradigm of clarity or precision," *Pease & Curren Refining, Inc. v. Spectrolab, Inc.,* 744 F.Supp. 945 (C.D.Cal.1990)

(quoting *Artesian Water Co. v. New Castle County,* 851 F.2d 643, 648 (3rd Cir.1988), "[it is not] within the judicial function of a court to supply omissions in a statute even though that which

Third, courts that have concluded CERCLA explicitly authorizes an award of fees as a response cost often place emphasis on the purposes of CERCLA. *See, e.g., General Elec.*, 920 F.2d at 1422; *Key Tronic Corp.*, 766 F.Supp. at 871–72; *Pease & Curren Refining, Inc.*, 744 F.Supp. at 951 (emphasizing policy considerations in awarding fees to private party under CERCLA). It is not for this court to impose a fee shifting provision simply because it may be consistent with the statutory scheme or purposes of CERCLA. "The power to declare what the law shall be belongs to the legislative branch of the government; the power to declare what the law is, or has been, belongs to the judicial branch of government." *In re Shear*, 139 F.Supp. 217, 220 (N.D.Cal.N.D.1956). Cf. *Library of Congress v. Shaw*, 478 U.S. 310, 321, 106 S.Ct. 2957, 2965, 92 L.Ed.2d 250 (1986) ("[p]olicy, no matter how compelling, is insufficient, standing alone, to waive [government immunity to prejudgment interest].").

The court cannot compensate for a decisive lack of explicitness in the statute by importing its informed opinion of what measures would best achieve the purposes of CERCLA. *See Fallowfield Development Corp.*, 766 F.Supp. at 338. The "generalized commands" of the statute provide an insufficient basis for concluding that Congress intended attorneys' fees to be recoverable as response costs by a private party. *Runyon*, 427 U.S. at 186, 96 S.Ct. at 2602.

### 2. *Prejudgment Interest*

■ The United States maintains that sovereign immunity bars the award of prejudgment interest against the United States. "In the absence of express congressional consent to the award of interest separate from a general waiver of immunity to suit, the United States is immune from an interest award." *Shaw*, 478 U.S. at 314, 106 S.Ct. at 2961. Section 9607(a) provides liability for "persons" under CERCLA. Title 42 of United States Code

§ 9601(21) defines the term "person" to mean,

> an individual, firm, corporation, association, partnership, consortium, joint venture, commercial entity, the United States Government, ...

Section 9607(a) provides:

> The amounts recoverable in an action under this section shall include interest on the amounts recoverable under subparagraphs (A) through (D) [of paragraph (a)(4) of this section. Such interest shall accrue from the later of (i) the date payment of a specified amount is demanded in writing, or (ii) the date of the expenditure concerned.... Title

In addition, § 9620 provides:

> Each department, agency, and instrumentality of the United States ... shall be subject to, and comply with, this chapter in the same manner and to the same extent, both procedurally and substantively, as any nongovernmental entity, *including liability under section 9607 of this title.*

(emphasis added).

Reading § 9620 in conjunction with § 9607, the court in *Key Tronic* found an explicit waiver of sovereign immunity. *See Key Tronic*, 766 F.Supp. at 868–69. In doing so, it distinguished *Shaw* on the grounds that in that case "the statute [ ] did not make any reference to prejudgment interest." *Id.* at 868.

Congress expressly consented to waive immunity for prejudgment interest in CERCLA. Section 9620 subjects the United States to liability under § 9607. Section 9607 provides for awards of prejudgment interest. Moreover, § 9601 includes the United States within the definition of "person" as that term is used throughout the liability provisions of § 9607. While the court has to read two sections together to find the waiver, it is nonetheless explicit and unambiguous. To hold otherwise, would delete from the statute some of the

was omitted may have been omitted by oversight or inadvertence." *In re Shear*, 139 F.Supp. 217, 221 (N.D.Cal.N.D.1956). "Congress itself presumably has the power and judgment to pick and choose among its statutes and to allow

attorneys' fees under some, but not others." *See Fallowfield Development Corp. v. Strunk*, 766 F.Supp. 335, 337 (E.D.Pa.1991) (quoting *Alyeska*).

liability provisions and imply a limitation on liability where it does not exist. Such a result is contrary to two explicit provisions of CERCLA subjecting the United States to liability under § 9607 without limitation.

## C. Motion to Strike Demand for Jury Trial

Finally, the United States argues the demand for jury trial should be stricken. Catellus concedes it does not have a right to jury trial with respect to the FTCA and CERCLA claims against the United States but properly asserts a right to jury trial with respect to claims against the other co-defendants. The parties agree that the court in its discretion may impanel an advisory jury over the claims asserted against the United States pursuant to Fed. R.Civ.P. 39(c). *See* 9 Charles A. Wright and Arthur R. Miller, *Federal Practice and Procedure*, § 2335 at 128 (1971 & Supp.1991). The proper time to exercise that discretion is at the time of the final Pretrial Conference when the trial procedures and issues have been defined. Consequently, the motion to strike is denied.

## III. *Plaintiff's Motion*

■ Catellus moves for summary judgment on the first claim for relief seeking a declaration that the United States is liable under CERCLA. There are four elements of such liability:

(1) that the warehouse is a "facility",

(2) that a "release" or "threatened release" of a hazardous substance has occurred from the warehouse,

(3) that Catellus has incurred "response costs" as a result of the release or threatened release, and

(4) that the defendant "arranged for disposal" of hazardous substances at the warehouse within the meaning of CERCLA Section 107(a)(3) [42 U.S.C. § 9607(a)(3).

*See T & E Industries, Inc.*, 680 F.Supp. at 708. The first two elements are admitted.

CERCLA authorizes suit against four classes of parties: (1) the owners and operators of a facility at which a release or threatened release of hazardous substances exists; (2) the owners or operators of such a facility any time in the past when hazardous substances were disposed of; (3) any treatment or entity who "arranged for" the treatment or disposal of a hazardous substance at the facility; and (4) any persons who transport hazardous substances to the facility. *United States v. Aceto Agric. Chemicals Corp.*, 872 F.2d 1373, 1377 (8th Cir.1989). In this case, Catellus asserts the United States "arranged for" the disposal of hazardous substances and thus is liable under 42 U.S.C. § 9607(a)(3).

Section 9607(a)(3) imposes liability on "any person who by contract, agreement, or otherwise arranged for disposal or treatment, of hazardous substances ..." Courts examining the issue have concluded that one who "otherwise arranged for disposal" cannot escape liability—under CERCLA § 107(a)(3)—by the artifice of calling the "arrangement" a "sale." *United States v. Conservation Chemical Co.*, 619 F.Supp. 162, 237–41 (W.D.Mo.1985) (sale of fly ash and lime slurry by-products); *United States v. Ward*, 618 F.Supp. 884, 894–96 (E.D.N.C.1985) (sale of PCB-contaminated oil); and *United States v. A & F Materials Co.*, 582 F.Supp. 842, 845 (S.D.Ill.1984) (sale of spent caustic solution). Nevertheless, "[i]f a party merely sells a product, without additional evidence that the transaction includes an 'arrangement' for the ultimate disposition of a hazardous substance, CERCLA liability would not be imposed." *Florida Power & Light Co. v. Allis Chalmers Corp.*, 893 F.2d 1313, 1317 (11th Cir.1990). "Whether an 'arrangement for' disposal exists depends on the facts of each case." *Id.* at 1317–18 (rejecting per se rules for establishing liability in this context).

Plaintiff contends that whether a sale triggers liability depends on the seller's purpose in the transaction. Plaintiff argues that if the seller uses the transaction to "get rid of" hazardous substances for which no longer has any use, the transaction is an "arrangement for disposal" under CERCLA § 107(a)(3). *See Prudential Ins. Co. of America v. U.S. Gypsum*, 711 F.Supp. 1244, 1254 (D.N.J.1989) ("If the

transaction involves ... sale of a new useful product containing a hazardous substance, as opposed to sale of a substance merely to 'get rid of it,' a claim under CERCLA may not be available."). The United States argues that plaintiff oversimplifies the inquiry. In its view, whether a transaction is an "arrangement for" disposal depends at least in part on whether the material sold could be used for its original and customary purpose without recycling or other treatment. *Cf. Prudential Ins. Co. of America*, 711 F.Supp. at 1253–54; *C. Greene Equipment Corp. v. Electron Corp.*, 697 F.Supp. 983 (N.D.Ill.1988) (sale of equipment containing hazardous oil not an "arrangement for disposal" because the equipment was nonleaking and usable when sold, and the hazardous substance was hence enclosed when sold, the sale did not constitute an "affirmative[ ] act to dispose of waste in some manner by dumping the waste on the site in issue.").

Regardless of whether either proposed test or a combination of the two applies, the resolution of the issue before the court depends upon inferences to be drawn from facts and the weight accorded a given inference contained in deposition testimony and declarations. The court does not feel it would be appropriate to test such inferences on a motion for summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986).[5]

## IV. *Conclusion*

The United States' motion to dismiss is granted in part and denied in part. Plaintiff's negligence claim challenging the decision to sell surplus material, and the terms and conditions upon which such material was sold, is barred by the discretionary function exception to the FTCA. On the other hand, when the government sells material in violation of its own mandatory and specific rules, or sells material under conditions not grounded in regulatory policy, the exception does not bar a tort action. Plaintiff's conspiracy claim rests on the underlying allegation of wrongdoing and thus survives the motion to dismiss to the same extent.

The United States' motion for judgment on the pleadings is granted in part and denied in part. CERCLA does not specifically authorize the award of fees to a private party as response costs. However, the provisions of CERCLA explicitly waive the government's sovereign immunity to suits for prejudgment interest. The motion to strike the jury demand is denied. The court prefers to reserve its exercise of discretion to impanel an advisory jury on plaintiff's CERCLA and FTCA claims. Finally, plaintiff's motion for summary judgment on the issue of the United States' liability is denied. The ultimate findings of fact necessary to establish the liability of the United States depend on inferences to be drawn from facts and the weight to be accorded various inferences. The court believes such determinations are better left for trial.

IT IS THEREFORE ORDERED that the United States' motion to dismiss the sixth and twelfth claims for lack of jurisdiction be, and the same is, hereby denied in part and granted in part to the extent discussed above.

IT IS FURTHER ORDERED that United States' motion for judgment on the pleadings be, and the same is, hereby granted with respect to the claim for attorneys' fees and denied with respect to the claim for prejudgment interest.

IT IS FURTHER ORDERED that the United States' motion to strike the demand for jury trial be denied.

IT IS FURTHER ORDERED that plaintiff's motion for summary judgment on the issue of the United States' liability under CERCLA be, and the same is, hereby denied.

---

5. Because the court concludes summary judgment cannot be granted on the issue whether the United States arranged for the disposal of hazardous waste, it is not necessary to reach the issue whether Catellus incurred "response costs." *See* 42 U.S.C. § 9607(a).